UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

ALEXIS LUCENTE, on behalf of herself and all others : 
similarly situated, and ALVIN SUMIGCAY, individually, :    Case No. 23 Civ. 3560
                                                      :
                              Plaintiffs,             :    CLASS AND COLLECTIVE
                                                      :    ACTION COMPLAINT
            -against-                                 :
                                                      :
EAD ENTERTAINMENT, LLC, MUSE PAINTBAR, LLC, :
and MUSE TRIBECA, LLC,                                :
                                                      :
                              Defendants.             :
------------------------------------------------------------------------ X

Plaintiff Alexis Lucente, on behalf of herself and all others similarly situated, and Alvin

Sumigcay, individually (collectively, "Plaintiffs"), by and through their attorneys Kessler Matura

P.C., complaining of EAD Entertainment, LLC, Muse Paintbar, LLC, and Muse Tribeca, LLC

(collectively, "Defendants"), allege as follows:

## **<u>INTRODUCTION</u>**

1.      Defendants operate a chain of event/art class spaces, referred to as "studios," known

as Muse Paintbar, where customers paint in a social group, while being served food and drink by

Defendants' employees, such as Plaintiffs.

2.      According to Muse Paintbar's website, there are 23 studios across Connecticut,

Massachusetts, Maryland, Maine, New Hampshire, New York, Rhode Island, and Virginia.

3.      Muse Paintbar has five locations in New York:

        a.      837 Franklin Avenue, Garden City, New York;

        b.      134 Main Street, Port Jefferson, New York;

        c.      329 Greenwich Street, New York, New York;

        d.      265 Market Street, Yonkers, New York; and

        e.      84 Mamaroneck Avenue, White Plains, New York.

4.      Defendants employed Alexis Lucente, those individuals similarly situated to her, and Alvin Sumigcay, as servers/classroom facilitators ("Servers") at New York studios.

5.      Defendants refer to employees in the Server position as "Artists."

6.      Servers set up for and clean after the events, serve food and drinks to customers, while also facilitating the events.

7.      At the end of each event, Defendants routinely receive gratuities from customers for their employees' services.

8.      Instead of directing the tips to Servers, Defendants split the tips between Servers and location managers ("Managers"), who hold meaningful supervisory authority over the Servers. Defendants then do not list cash tips on Server wage statements.

9.      Defendants' tip pool distribution policy violates the Fair Labor Standards Act of 1938 (the "FLSA"), as amended, 29 U.S.C. § 201, *et seq.* and the New York Labor Law ("NYLL" or "N.Y. Lab. Law") and appropriate rules and regulations.

10.      To remedy these violations of the wage-and-hour provisions of the FLSA, Alexis Lucente brings this action on behalf of herself and all similarly situated current and former Servers employed by Defendants within the last three years preceding the filing of this Complaint who elect to opt-in to this action pursuant to the FLSA (the "FLSA Collective").  At the earliest time possible, she seeks permission to give notice of this action pursuant to 29 U.S.C. § 216(b) to the proposed FLSA Collective members.

11.      To remedy these violations of the NYLL, Alexis Lucente brings this action on behalf of herself and all similarly situated current and former Servers employed by Defendants within the last six years preceding the filling of this Complaint (the "Tipping Sub-Class").

12.     Servers and kitchen crewmembers ("Studio Employees") perform a significant amount of manual work to complete their primary duties.  Their manual work includes set up for events, clean up during and after events, food and drink preparation, and food and drink service. Nevertheless, Defendants pay the Studio Employees on a biweekly basis, contravening NYLL § 191(1)(a)'s requirement of weekly pay for "manual workers."

13.     To remedy these violations of the NYLL's pay-frequency requirements, Alexis Lucente brings this action on behalf of herself and all similarly situated current and former Studio Employees employed by Defendants within the last six years preceding the filing of this Complaint (the "Pay Frequency Sub-Class").

14.     Lucente seeks class certification under Federal Rule of Civil Procedure 23 to remedy violations of NYLL Article 6 § 190, *et seq*., and Article 19 § 650, *et seq*., and the supporting New York State Department of Labor regulations on behalf of the Tipping Sub-Class and the Pay Frequency Sub-Class (collectively, the "New York Class").

## JURISDICTION & VENUE

15.     Jurisdiction of the Court over this controversy is based upon 29 U.S.C. § 201, *et seq*. and 28 U.S.C. § 1331.

16.     This Court has jurisdiction over all state law claims brought in this action pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

18.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

### *Plaintiff Alexis Lucente*

19.     Alexis Lucente is a resident of the County of Nassau, State of New York.

20.     At all times relevant to the Complaint, Lucente was an "employee" within the meaning of Section 3(e) of the FLSA, 29 U.S.C. § 203(e), and N.Y. Lab. Law §§ 190(2) and 651(5).

21.     At all times relevant, Lucente was employed by Defendants as a Server.

22.     Lucente has expressed her consent to make these claims against Defendants by filing a written consent form, pursuant to 29 U.S.C. § 216(b).

### *Plaintiff Alvin Sumigcay*

23.     Alvin Sumigcay is a resident of the County of Nassau, State of New York.

24.     At all times relevant to the Complaint, Sumigcay was an "employee" within the meaning of Section 3(e) of the FLSA, 29 U.S.C. § 203(e), and N.Y. Lab. Law §§ 190(2) and 651(5).

25.     Sumigcay was employed by Defendants as a Server from in or around October 2018 through September 2021 and as a Manager from in or around September 2021 until May of 2022.

26.     Sumigcay has expressed his consent to make these claims against Defendants by filing a written consent form, pursuant to 29 U.S.C. § 216(b).

### *Defendants Muse Paintbar, LLC*

27.     Upon information and belief, Muse Paintbar, LLC was and still is a foreign corporation, authorized to do business pursuant to the laws of the State of New York.

28.     Upon information and belief, Muse Paintbar, LLC's headquarters is located at 329 Greenwich Street, New York, New York.

29.    At all times relevant, Muse Paintbar, LLC was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d), and N.Y. Lab. Law § 190(3).

30.    At all times hereinafter mentioned, the activities of Muse Paintbar, LLC constituted an "enterprise" within the meaning of Section 3(r) & (s) of the FLSA, 29 U.S.C. § 203(r) & (s).

31.    Upon information and belief, Muse Paintbar, LLC maintained control, oversight, and direction over its operations and employment practices.

32.    At all times hereinafter mentioned, Muse Paintbar, LLC employed employees, including Plaintiffs, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

33.    Upon information and belief, at all times relevant, Muse Paintbar, LLC's annual gross volume of business was not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

***Defendants Muse Tribeca, LLC***

34.    Upon information and belief, Muse Tribeca, LLC was and still is a foreign corporation, authorized to do business pursuant to the laws of the State of New York.

35.    Upon information and belief, Muse Tribeca, LLC's headquarters is located at 329 Greenwich Street, New York, New York.

36.    Upon information and belief, Muse Tribeca, LLC's primary place of business was the studio at 329 Greenwich Street, New York, New York.

37.    At all times relevant, Muse Tribeca, LLC was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d), and N.Y. Lab. Law § 190(3).

38.     At all times hereinafter mentioned, the activities of Muse Tribeca, LLC constituted an "enterprise" within the meaning of Section 3(r) & (s) of the FLSA, 29 U.S.C. § 203(r) & (s).

39.     Upon information and belief, Muse Tribeca, LLC maintained control, oversight, and direction over its operations and employment practices.

40.     At all times hereinafter mentioned, Muse Tribeca, LLC employed employees, including Plaintiffs, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

41.     Upon information and belief, at all times relevant, Muse Tribeca, LLC's annual gross volume of business was not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

***The Muse Defendants***

42.     Upon information and belief, EAD Entertainment, LLC – formerly known as EAD, LLC – purchased Muse Paintbar in or around 2020.

43.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants had common ownership, including Stanley J. Finch.

44.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, Stanly J. Finch was listed as a principal on all of the Muse Defendants' liquor licenses.

45.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants shared a common website.

46.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants shared a common headquarters.

47.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants constituted a unified operation.

48.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants constituted a common enterprise.

49.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants constituted an integrated enterprise.

50.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants had interrelated operations.

51.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants shared employees.

52.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants maintained control, oversight, and direction over their employees, including timekeeping, payroll and other employment practices that applied to them.

53.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants applied the same employment policies, practices, and procedures, including policies, practices, and procedures with respect to tip sharing and pay frequency.

54.     Prior to EAD Entertainment, LLC's purchase of Muse Paintbar, the Muse Defendants were the sole or primary employers of Defendants' workforce.

55.     Upon information and belief, the Muse Defendants are not able to satisfy a judgment in this case.

***Defendants EAD Entertainment, LLC***

56.     Upon information and belief, EAD Entertainment, LLC was and still is a foreign corporation, authorized to do business pursuant to the laws of the State of New York.

57.     Upon information and belief, EAD Entertainment, LLC is headquartered at 1230 Peachtree Street NE, Ste 1750, Atlanta, GA 30339.

58.     EAD Entertainment, LLC was previously named EAD, LLC, changing its name on or around March 3, 2020.

59.     EAD Entertainment, LLC presently does business as Muse Paintbar.

60.     EAD Entertainment, LLC holds the liquor licenses for Defendants' Muse Paintbar studios.

61.     At all times relevant, EAD Entertainment, LLC was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d), and N.Y. Lab. Law § 190(3).

62.     At all times hereinafter mentioned, the activities of EAD Entertainment, LLC constituted an "enterprise" within the meaning of Section 3(r) & (s) of the FLSA, 29 U.S.C. § 203(r) & (s).

63.     Upon information and belief, EAD Entertainment, LLC maintained control, oversight, and direction over its operations and employment practices.

64.     At all times hereinafter mentioned, EAD Entertainment, LLC employed employees, including Plaintiffs, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

65.     Upon information and belief, EAD Entertainment, LLC's annual gross volume of business is not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

*EAD Entertainment, LLC Took Over Muse Paintbar*

66.     On August 29, 2019, Chatham Capital Management IV, LLC ("Chatham") filed a Complaint for Breach of Contract and for Appointment of a Receiver against Muse and two of its related entities, Muse Tribeca, LLC, and Muse Holdings, LLC.  *See* Complaint, *Chatham Capital Management IV, LLC v. Muse Paintbar, LLC*, No. 1:19 Civ. 1611 (D. Del. Aug. 29, 2019), ECF No. 1.

67.     Chatham alleged that Muse Paintbar, LLC had defaulted on substantial loans Chatham had made to Muse Paintbar, LLC and that Muse Paintbar, LLC was in financial despair.

68.     The Delaware District Court appointed a receiver on August 30, 2019.  *See Chatham Capital Management IV, LLC v. Muse Paintbar, LLC*, No. 1:19 Civ. 1611, ECF No. 9 (D. Del. Aug. 30, 2019).

69.     Upon motion from the receiver, the Court issued an Order and Final Judgment Approving Sale of Substantially All Receivership Assets to EAD, LLC.  *See Chatham Capital Management IV, LLC v. Muse Paintbar, LLC*, No. 1:19 Civ. 1611, ECF No. 36 (D. Del. Mar. 2, 2020).

70.     At the time of the hearing on the receiver's motion for a sale, EAD, LLC, as a successor in interest to Chatham, was owed "not less than $15 million" by Muse.  *Id.* ¶ 2.

71.     Thereafter, upon information and belief, the Muse Defendants' assets were sold to EAD, LLC.

72.     EAD, LLC changed its name to EAD Entertainment, LLC on March 3, 2020.

73.     The receivership ended in 2022, consistent with the Delaware Court's order stating that "[u]pon the sale of all assets or other resolution of the receivership, this receivership shall terminate without further order of the Court[,]" after the receiver filed its final status reports with

the Delaware Court. *See Chatham Capital Management IV, LLC v. Muse Paintbar, LLC*, No. 1:19 Civ. 1611 (D. Del. Mar. 28, 2022), ECF No. 92.

74.    After or as part of EAD Entertainment, LLC's  acquisition of Muse Paintbar, EAD Entertainment, LLC  began running and operating the Muse Paintbar locations.

75.    For example, EAD Entertainment, LLC now holds the liquor licenses for the Muse Paintbar locations in New York.

76.    EAD Entertainment, LLC petitioned the applicable local governments throughout the United States to transfer Muse Defendants' liquor licenses to EAD Entertainment, LLC.

77.    On or around April 2020, EAD Entertainment, LLC applied for the liquor license for 329 Greenwich Street to be transferred from Muse Tribecca, LLC to EAD Entertainment, LLC.

78.    On May 7, 2020, EAD Entertainment, LLC through counsel, applied for the liquor license held by Muse Paintbar, LLC, related to the Muse Paintbar located at 245 Commercial Street, Portland, ME 04101.

79.    On June 23, 2020, EAD Entertainment, LLC sought and received a transfer of an Annual Beer and Malt Beverages Restaurant License, Common Victualler, Seven Day Entertainment and Sunday Entertainment License from Muse Paintbar, LLC, as it relates to its Foxborough, MA studio.

80.    In or around July 2020, EAD Entertainment, LLC requested approval for a Wine & Malt Alcohol License, a Common Victualler License, an Entertainment by Patrons License and a Sunday Hours License from the City of Somerville Licensing Commission related to the Muse Paintbar at 461 Artisan Way, #425, Somerville, MA 02145.

81.     In or around August 2020, EAD Entertainment, LLC petitioned the Town of Lynnfield for a transfer of the Restaurant Wine and Malt Beverages License from Muse Paintbar, LLC, as it relates to the Muse Paintbar studio located at 1130 Market Strett, Lynnfield, MA.

82.     In or around November 2020, EAD Entertainment, LLC applied to the Board of License Commissioners for Prince George's County, Maryland, to transfer the beer and wine license from Muse Paintbar LLC, as it relates to 122 Waterfront Street, National Harbor, MD 20775.

83.     When applying to transfer the liquor license at the Portland location from Muse, EAD Entertainment, LLC, listed EAD Holdings, LLC as the sole member.

84.     EAD Entertainment, LLC is a subsidiary of Chatham, also located at 1230 Peachtree Street NE, Ste 1750, Atlanta, GA 30339.

85.     Brian G. Reynolds ("Reynolds") is a managing partner of Chatham Capital.

86.     Reynolds is the LLC Manager of EAD Entertainment, LLC.

87.     EAD Entertainment, LLC holds Reynolds out as its LLC Manager.

88.     Reynolds is authorized to bind EAD Entertainment, LLC.

89.     Reynolds signed applications for liquor licenses for EAD Entertainment, LLC.

90.     Reynolds signed applications to transfer liquor licenses to EAD Entertainment, LLC.

**Defendants**

91.     Upon information and belief, EAD Entertainment, LLC controls the Muse Defendants' present operations.

92.     Upon information and belief, Defendants use a common website to promote Muse Paintbar.

93.    EAD Entertainment, LLC acquired the assets of Muse Defendants.

94.    EAD Entertainment, LLC continued the operation of Muse Defendants' studios, without interruption.

95.    EAD Entertainment, LLC continued the wage-and-hour practices of Muse Defendants, upon acquiring Muse Defendants' assets.

96.    EAD Defendants retained many of Muse Defendants' executives and management, including Reese Pippins ("Pippins").

97.    Defendants hold Pippins as the CEO of Muse Paintbar.

98.    Defendants constitute a unified operation.

99.    Defendants constitute a common enterprise.

100.    Defendants constitute an integrated enterprise.

101.    Defendants have interrelated operations.

102.    Defendants share employees.

103.    Defendants maintain control, oversight, and direction over their employees, including timekeeping, payroll and other employment practices that applied to them.

104.    Defendants apply the same employment policies, practices, and procedures, including policies, practices, and procedures with respect to tip sharing.

105.    Defendants apply the same employment policies, practices, and procedures, including policies, practices, and procedures with respect to the biweekly payment of their New York employees.

106.    Upon information and belief, Defendants' annual gross volume of business is not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

## COMMON FACTUAL ALLEGATIONS

### *Defendants' Tip Pool Policy*

107.    Defendants operate studio spaces where customers can participate in a social painting class, with bar and food service.  Defendants' website states that they offer "the premier paint & sip experience."  *See* www.musepaintbar.com (last visited Apr. 21, 2023).

108.    Each of Defendants' locations has a kitchen, with kitchen staff, and a menu of finger food, desserts, and a variety of beverages.  *See* www.musepaintbar.com/menu/ (last visited Apr. 21, 2023.

109.    To run the studio classes, Defendants employ Servers and a location Manager.

110.    Servers set up the studio events, putting out paint supplies and canvases, and stock the bar.  During the events, Servers facilitate the class, take customer food and drink orders, and serve drinks and food.  After class, Servers clean up the space, bussing and wiping down tables, disposing of waste, picking up and reorganizing art supplies, and sweeping and mopping the floors.

111.    The Manager holds supervisory power over their Muse location.  The Manager controls staff scheduling, hires and fires employees, issues discipline to employees with poor performance, provides training and feedback to employees, and generally ensures compliance with company guidelines.  In addition to administrative responsibilities, Managers run the events and handle sales for their location.  Managers also participate in event set up, service, and clean up.

112.    At the end of each class, customers routinely leave gratuities, either via credit card or in cash.

113.    In or around January 2020, Defendants began a written tip pool policy, which divides the tips among all staff members paid on an hourly basis.  Defendants continue to distribute tips under the same policy.

114.    Under the tip pool policy, Muse Managers, who are also paid on an hourly basis, receive a portion of the tip pool.

115.    Defendants do not possess a good faith basis for distributing a portion of gratuities to Managers.

116.    A reasonable employer inquiring into FLSA standards, including 29 U.S.C. § 203(m)(2)(B), and New York's wage payment rules would know that managers should not receive a portion of employee tips.

117.    Upon information and belief, Defendants did not keep accurate records of the cash tips received from customers and how such tips were distributed to Servers.

118.    Defendants failed to furnish Servers with accurate statements of wages listing all tips earned.  Specifically, Defendants excluded cash tips provided to Servers from their wage statements, while at the same time directing some of the cash tips to Managers.  Additionally, Defendants failed to list a phone number for the employing corporation on the wage statements.

***Defendants' Pay Frequency Policy***

119.    Servers and kitchen staff spend more than 25% of their work hours conducting manual work.

120.    Servers carry and place art supplies on tables and in receptacles, restock art supplies and drinks, serve food and drinks, wipe down tables and bathrooms, pick up and dispose of waste, and sweep and mop floors.

121.    Kitchen staff prepare the kitchen for service, cook food, restock food and kitchen items, and clean the kitchen, including dishes, pots, pans, and utensils.

122.    Defendants uniformly applied a biweekly payment policy to Studio Employees employed in New York State.

123.    Defendants memorialized this policy in their handbook, wherein it states that, except for Rhode Island employees, "[a]ll employee wages are payable bi-weekly, on every other Friday."

124.    Defendants' pay period is made up of two weeks, starting on a Sunday and ending on a Saturday.

125.    Defendants paid Studio Employees six calendar days after the end of each two-week pay period.

126.    For example, the pay period starting January 30, 2022 ended on February 12, 2022. Defendants issued payment for the pay period on February 18, 2022.

127.    Defendants do not possess a good faith basis for deciding to pay and thereafter continuing to pay its employees' wages biweekly.

128.    The State of New York has required employers to pay certain manual workers on a weekly basis since the 19th Century.  *See* N.Y. Session Law 1890, Ch. 388 § 1; N.Y. Session Law 1897, Ch. 415 §§ 2, 10.

129.    A reasonable employer inquiring into New York's wage payment rules would know that manual workers are to be paid each week given that, for example, the rules are listed on the Department of Labor's Frequency Asked Questions flyer regarding the Wage Theft Prevention Act    (https://dol.ny.gov/system/files/documents/2021/03/wage-theft-prevention-act-frequently-asked-questions_0.pdf) and many legal, human resource, and employment blogs brought attention to this issue following the First Department's 2019 decision in *Vega v. CM & Assocs. Constr. Mgmt. LLC*, 175 A.D.3d 1144 (1st Dep't 2019).

130.    Upon information and belief, Defendants do not qualify for the exemption from the NYLL's weekly payment requirement because they do not employ over 1,000 in the state of New York.

131.    Upon information and belief, Defendants did not apply for the exemption.

132.    The New York State Department of Labor has not authorized Defendants to pay their employees on a biweekly basis.

133.    Studio Employees were uniformly deprived of the ability to use – i.e., spend, invest, or save – their earned wages during periods in which payment was illegally delayed.

134.    Studio Employees lost the opportunity to grow such untimely-paid wages through investment or otherwise benefit financially, including by paying down debts earlier.

135.    Defendants, however, benefited from the delayed payments.  That is, among other things, Defendants reduced their administrative costs by paying less frequently than required and used the extra money they were holding as they pleased, until payroll was cut.

## FLSA COLLECTIVE ACTION CLAIMS

136.    Upon information and belief, there are more than 100 current and former Servers that are similarly situated to Lucente, whose tips were improperly shared with Managers.

137.    Lucente sues on her own behalf and as the class representative (the "Class Representative") and brings the First Cause of Action on behalf of herself and all similarly situated persons who have worked for Defendants as Servers and elect to opt-in to this action.

138.    The Class Representative represents other Servers and is acting on behalf of the interests of those Servers, as well as her own interests in bringing this action.

The Class Representative seeks to proceed as a collective action with regard to the First Cause of Action, pursuant to 29 U.S.C. § 216(b) on behalf of herself and the FLSA Collective.

139.    Defendants were aware or should have been aware that the law prohibited them from passing employee tips onto their Managers.

140.    Upon information and belief, Defendants applied the same unlawful tip-pooling policies and practices to its Servers throughout all of its studios.

141.    The FLSA Collective is readily identifiable and locatable through use of the Defendants' records.  The FLSA Collective should be notified of and allowed to opt-in to this action, pursuant to 29 U.S.C. § 216(b).  Unless the Court promptly issues such a notice, the FLSA Collective, who have been unlawfully deprived of overtime pay in violation of the FLSA, will be unable to secure compensation to which they are entitled, and which has been unlawfully withheld from them by Defendants.

## FEDERAL RULE OF CIVIL PROCEDURE RULE 23
## CLASS ALLEGATIONS

142.    The Class Representative brings the Second Cause of Action on her own behalf and as a class action, on behalf of those similarly situated, pursuant to Fed. R. Civ. P. 23(a) and (b) referred to in this Complaint as the Tipping Sub-Class

143.    The Class Representative brings the Third Cause of Action on her own behalf and as a class action, on behalf of those similarly situated, pursuant to Fed. R. Civ. P. 23(a) and (b) referred to in this Complaint as the Pay Frequency Sub-Class.

144.    The persons in the New York Class are so numerous that joinder of all members is impracticable.  Although, the precise number of such persons is unknown, and facts upon which the calculation of that number are presently within the sole control of the Defendants, there are approximately more than 100 members of the New York Class during the New York Class Period.

145.    There are questions of law and fact common to the New York Class that predominate over any questions solely affecting individual members of the New York Class, including but not limited to:

    a.  Whether Defendants unlawfully distributed portions of gratuities from the Plaintiffs and the Tipping Sub-Class to employees who were ineligible to receive gratuities, in violation of N.Y. Lab. Law § 196-d and the New York State Department of Labor Regulations, 12 N.Y.C.R.R. § 146-2.18;

    b.  Whether Defendants unlawfully failed to furnish accurate wage statements to the Plaintiffs and the Tipping Sub-Class, in violation of N.Y. Lab. Law § 195;

    c.  Whether the Plaintiffs and Pay Frequency Sub-Class meet the definition of "manual workers" under N.Y. Lab. Law § 191(1);

    d.  Whether Defendants were required to pay the Plaintiffs and the Pay Frequency Sub-Class on a weekly basis;

    e.  Whether Defendants failed to pay the Plaintiffs and the Pay Frequency Sub-Class on a weekly basis;

    f.  Whether Defendants' failure to pay Plaintiffs and the Pay Frequency Sub-Class on a weekly basis resulted from a reasonable and good-faith belief that its biweekly payroll practice complied with the NYLL;

    g.  Whether Defendant's policy of distributing Servers' tipped income to Managers was instituted willfully or with reckless disregard for the law;

    h.  The proper measure of damages sustained by the Plaintiffs and the New York Class; and,

    i.  Whether Defendants should be enjoined from such violations in the future.

146.    The Class Representative fairly and adequately protects the interests of the New York Class and has no interests antagonistic to the class.  Plaintiffs are represented by attorneys who are experienced and competent in both class litigation and employment litigation.

147.    A class is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against a

corporate defendant.  The damages sustained by individual class members are small, compared to the expense and burden of individual prosecution of this litigation.  Class action treatment will obviate unduly duplicative litigation and the possibility of inconsistent judgments.

148.    The Class Representative and the New York Class have been equally affected by Defendants' tip-pooling and pay frequency policies.  Moreover, members of the New York Class are still employed by Defendants and may be reluctant to raise individual claims for fear of retaliation.

149.    Defendants have acted or refused to act on grounds generally applicable to the New York Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

150.    The Class Representative's claims are typical of those of the class.  The Class Representative and the other class members were subjected to Defendants' policies, practices, programs, procedures, protocols and plans alleged herein concerning the distribution of tips to Defendants' agents and biweekly pay.  The job duties of the Class Representative are typical of those of the class members.

151.    The Class Representative intends to send notice to all members of the New York Class to the extent required by Rule 23.

**PLAINTIFFS' FACTUAL ALLEGATIONS**

*Plaintiff Alexis Lucente*

152.    Alexis Lucente began her employment as a Server with Defendants in or around February 2016 and remains employed.

153.    Defendants employ Lucente at its Garden City, New York location.

154.    As a Server, Lucente facilitated paint classes, while serving food, bartending, restocking drinks and supplies, laying out supplies, and cleaning the studio space.

155.    Customers regularly left tips for employees at the end of the classes, some in cash and some via credit card.

156.    The employees, including Lucente, split cash tips at the end of each shift.  A portion of the cash tips went to the location Manager.

157.    Defendants distributed credit card tips with wage payments.  Defendants listed credit card tips paid to Lucente on her pay stubs.

158.    The location Manager also received and currently receives a portion of the credit card tips.

159.    On several occasions, Lucente complained about the tip-pooling practices to the Chief Executive Officer, accountant, and Regional Operations Manager.  After each complaint, Lucente was told that Muse Paintbar would not change their tip-pool policy "for accounting purposes."

160.    Lucente spent more than 25 percent of her work hours on physical tasks.  Prior to each class, Lucente removed various supplies from their stored locations, and placed them on tables for incoming customers.  Once customers arrived, Lucente took food and drink orders from customers, made drinks for customers, and carried food from the kitchen to tables.  Over the course of the class, Lucente bussed the tables, removing used plates and glasses.  Once class finishes, Lucente cleaned tables and paint stations, picked up supplies, such as brushes, canvases and paint, disposed of waste in garbage pales, placed supplies in their proper locations, restocked paint supplies, pumped unfinished wine bottles, swept and mopped floors, and wiped down bathroom mirrors and sinks.

161.    Lucente received her wages on a biweekly basis.

162.    Defendants distributed wage payments six days after the end of each pay period.

163.    For example, Lucente received a wage payment on March 4, 2022 for the period beginning on February 13, 2022 and ending on February 26, 2022.

164.    Upon information and belief, Defendants did not keep accurate records of hours worked by Lucente.

165.    Upon information and belief, Defendants did not keep accurate records of the cash tips received from customers and how such tips were distributed to Lucente.

166.    Defendants failed to furnish Lucente with accurate statements of wages listing all tips earned.  Specifically, Defendants excluded cash tips provided to Lucente from her wage statements, while at the same time directing some of the cash tips to Managers.  Additionally, Defendants failed to list a phone number for the employing corporation on the wage statements.

***Plaintiff Alvin Sumigcay***

167.    Alvin Sumigcay began working for Defendants in or around October 2018 as a Server in Defendants' Great Neck, New York location.

168.    In or around October 2019, Defendants changed Sumigcay's worksite to Garden City, New York.

169.    As a Server, Sumigcay facilitated paint classes, while serving food, bartending, restocking drinks and supplies, laying out supplies, and cleaning the class.

170.    Customers regularly left tips for employees at the end of the classes, some in cash and some via credit card.

171.    The employees, including Sumigcay, split cash tips at the end of each shift for which they were received.  A portion of the cash tips went to the location Manager.

172.    Defendants listed credit card tips paid to Sumigcay on his pay stubs.

173.    The location Manager also received a portion of the credit card tips.

174.    Sumigcay spent more than 25 percent of her work hours on physical tasks.  Prior to each class, Sumigcay removed various supplies from their stored locations, and placed them on tables for incoming customers.  Once customers arrived, Sumigcay took food and drink orders from customers, made drinks for customers, and carried food from the kitchen to tables.  Over the course of the class, Sumigcay bussed the tables, removing used plates and glasses.  Once class finished, Sumigcay cleaned tables and paint stations, picked up supplies, such as brushes, canvases and paint, disposed of waste in garbage pales, placed supplies in their proper locations, restocked paint supplies, pumped unfinished wine bottles, and swept and mopped floors.

175.    Sumigcay received his wages on a biweekly basis.

176.    Upon information and belief, Defendants did not keep accurate records of the cash tips received from customers and how such tips were distributed.  Defendants failed to furnish Sumigcay with accurate statements of wages listing all tips earned.  Specifically, Defendants excluded cash tips

177.    provided to Sumigcay from his wage statements, while at the same time directing some of the cash tips to Managers.  Additionally, Defendants failed to list a phone number for the employing corporation on the wage statements.

178.    In or around September 2021 through May 2022, Defendants employed Alvin Sumigcay as a Manager at the Garden City location.

179.    As a Manager, Alvin Sumigcay received a portion of the cash tips from each shift, as well as credit card tips on his paystub.

**FIRST CAUSE OF ACTION**
**FLSA – Tip Misappropriation**
**(On behalf of Plaintiffs and the FLSA Collective)**

180.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

181.    Defendants unlawfully kept tips received by their employees, including by allowing managers or supervisors to keep a portion of Plaintiffs' and FLSA Collective's tips, in violation of 29 U.S.C. § 203(m)(2)(B).

182.    Defendants' violations of the FLSA, as described in this Class and Collective Action Complaint, have been willful and intentional.

183.    Defendants did not make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiffs and the FLSA Collective.

184.    Because Defendants' violations of the FLSA were willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

185.    Plaintiffs have expressed their consent to make these claims against Defendants by filing written consent forms, pursuant to 29 U.S.C. § 216(b).

186.    As a consequence of the willful underpayment of wages, alleged above, Plaintiffs and the members of the FLSA Collective have incurred damages thereby and the Defendants are indebted to them in the amount of the unpaid tipped wages, together with interest, liquidated damages, attorneys' fees, and costs in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**NYLL – Tip Misappropriation**
**(On behalf of Plaintiffs and the Tipping Sub-Class)**

187.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

188.    Defendants unlawfully demanded, accepted, and retained, part of gratuities received for Plaintiffs and members of the Tipping Sub-Class, in violation of N.Y. Lab. Law § 196-d and the supporting New York State Department of Labor regulations.

189.    Defendants' location Managers held meaningful and significant authority or control over Plaintiffs and members of the Tipping Sub-Class, and in turn were Defendant's agents within the meaning of N.Y. Lab. Law § 196-d.

190.    Defendants have a policy and practice of unlawfully demanding, directly or indirectly, part of the gratuities received by Plaintiffs and members of the Tipping Sub-Class be shared with Defendants' location Managers, in violation of N.Y. Lab. Law § 196-d and the supporting New York State Department of Labor regulations.

191.    Defendants do not possess a good faith basis for believing that their tip-pooling practices complied with the law.

192.    As a consequence of the willful misappropriation of tips, alleged above, Plaintiffs and the members of the New York Class have incurred damages thereby and the Defendants are indebted to them in the amount of the unpaid gratuities, together with interest, liquidated damages, attorneys' fees, and costs in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**NYLL – Untimely Payment of Wages**
**(On behalf of Plaintiffs and the Pay Frequency Sub-Class)**

193.    Plaintiffs incorporate by reference all preceding allegations.

194.    Plaintiffs and members of the Pay Frequency Sub-Class meet the definition of "manual workers" under NYLL § 190(4).

195.    Defendants failed to pay Plaintiffs and the Class within seven days after the end of each workweek as required by NYLL § 191(1)(a).

196.    Defendants have not employed over 1,000 individuals in the State of New York for one or more consecutives years.

197.    Defendants have not received authorization under NYLL § 191(1)(a)(ii) from the Commissioner of Labor to pay its employees less frequently than once per week.

198.    Defendants do not possess a good faith basis for believing that its delayed payment of wages complied with the law.

199.    Plaintiffs and the Pay Frequency Sub-Class were uniformly deprived of the ability to use – i.e., spend, invest, or save – their earned wages during periods in which payment was illegally delayed.

200.    Plaintiffs and the Pay Frequency Sub-Class lost the opportunity to grow such untimely-paid wages through investment or otherwise benefit financially, including by paying down debts earlier.

201.    Due to Defendants' violations of NYLL § 191(1)(a), Plaintiffs and the Pay Frequency Sub-Class are owed liquidated damages amounting to the value of any late-paid wages during the six years prior to the filing of this complaint, interest, and reasonable attorneys' fees and costs pursuant to NYLL § 198.

**FOURTH CAUSE OF ACTION**
**NYLL – Notice and Record-Keeping Requirements**
**(On behalf of Plaintiffs and the Tipping Sub-Class)**

202.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

203.    Defendants failed to supply Plaintiffs and the Tipping Sub-Class with accurate statements of wages as required by N.Y. Lab. Law § 195, containing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of

employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

204.    Defendants' violations of N.Y. Lab. Law § 195, harmed Plaintiffs and the Tipping Sub-Class by facilitating Defendants' misappropriation of tips.

205.    Defendants' violations of N.Y. Lab. Law § 195, further resulted in an underreporting of Plaintiffs and the Tipping Sub-Class's wages.

206.    Due to Defendants' violations of N.Y. Lab. Law § 195, for each day that Defendants to provide a proper wage statement, Plaintiffs and the Tipping Sub-Class are entitled to damages of $250, or a total of $5,000, as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Alexis Lucente, on behalf of herself and all others similarly situated, and Alvin Sumigcay, seek the following relief:

A.    That, at the earliest possible time, Plaintiffs be allowed to give notice of this action, or that the Court issue such notice, to all persons who are presently, or have at any time during the three years immediately preceding the filing of this suit, up through and including the date of this Court's issuance of court-supervised notice, were employed by Defendants.  Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

B.    Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

C.      Designation of Plaintiff Alexis Lucente as representative of the Rule 23 Class, and counsel of record as Class Counsel;

D.      Misappropriated tips pursuant to the FLSA, NYLL, and the supporting regulations;

E.      Liquidated damages relating to lost wages, as provided for by FLSA § 216(b) and the NYLL;

F.      Liquidated damages relating to untimely wage payments, as provided for by N.Y. Lab. Law § 198;

G.      Statutory damages for Defendants' failure to provide accurate wage statements pursuant to N.Y. Lab. Law § 198;

H.      Pre-judgment interest and post-judgment interest as provided by law;

I.      Issuance of a declaratory judgment that the practices complained of in this action are unlawful;

J.      Reasonable incentive awards for the class representative to compensate her for the time she spent attempting to recover wages for the Class and for the risks she took in doing so;

K.      Attorneys' fees and costs of the action; and

L.      Such other injunctive and equitable relief as this Court shall deem just and proper.


Dated: Melville, New York
        May 11, 2023

                                Respectfully submitted,


                                By: /s/ *Troy l. Kessler*
                                        Troy L. Kessler

                                **KESSLER MATURA P.C.**
                                Troy L. Kessler
                                Garrett Kaske
                                Benjamin A. Goldstein

534 Broadhollow Road, Suite 275
Melville, NY 11747
Phone: (631) 499-9100
Fax: (631) 499-9120
tkessler@kesslermatura.com
gkaske@kesslermatura.com
bgoldstein@kesslermatura.com

***Attorneys for Plaintiff and
the Putative Class and Collective Actions***

# **EXHIBIT A**

**CONSENT TO BECOME A PARTY-PLAINTIFF**

1.  I consent to be a party plaintiff in a lawsuit against my employer, the corporations doing business as Muse Paintbar, including EAD Entertainment, LLC, Muse Paintbar, LLC, and any related entities, for alleged violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and any applicable state law.

2.  During the past three years, there were occasions when Muse Paintbar unlawfully withheld my tip-wages in violation of the Fair Labor Standards Act.

3.  I designate Kessler Matura P.C. to represent me and make decisions on my behalf concerning the litigation, including any settlement. I agree to be bound by any adjudication, whether it is favorable or unfavorable.

4.  I also consent to join any separate or subsequent action to assert my claims against Muse Paintbar and any other related entities potentially liable.


Date: 05 / 10 / 2023

_____
Signature

Alexis Lucente
_____
Print Name

## CONSENT TO BECOME A PARTY-PLAINTIFF

1. I consent to be a party plaintiff in a lawsuit against my employer, the corporations doing business as Muse Paintbar, including EAD Entertainment, LLC, Muse Paintbar, LLC, and any related entities, for alleged violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and any applicable state law.

2. During the past three years, there were occasions when Muse Paintbar unlawfully withheld my tip-wages in violation of the Fair Labor Standards Act.

3. I designate Kessler Matura P.C. to represent me and make decisions on my behalf concerning the litigation, including any settlement.  I agree to be bound by any adjudication, whether it is favorable or unfavorable.

4. I also consent to join any separate or subsequent action to assert my claims against Muse Paintbar and any other related entities potentially liable.

Date:  05 / 09 / 2023

_____
Signature

Alvin Sumigcay
_____
Print Name